No. 24-12443-F

---

## IN THE UNITED STATES COURT OF
## APPEALS FOR THE ELEVENTH CIRCUIT

---

JERRY JENNINGS,

*Plaintiff/Appellant,*

v.

J.W. CHEATHAM LLC,

*Defendant/Appellee.*

---

ON APPEAL FROM THE ORDER GRANTING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND
JUDGMENT ENTERED IN THE UNITED STATES DISTRICT
COURT FOR THE SOUTHERN DISTRICT OF FLORIDA
9:23-cv-80995
The Hon. Robin L. Rosenberg

---

### PRINCIPAL BRIEF OF APPELLANT JERRY JENNINGS

---

**CHRISTOPHER S. PRATER**
cprater@pollardllc.com

**JONATHAN E. POLLARD**
jpollard@pollardllc.com

**POLLARD PLLC**
401 E. Olas Blvd., #1400
Fort Lauderdale, FL 33301
Telephone: 954-332-2380

*Jennings v. JW Cheatham LLC*, No. 24-12443-F

## <u>CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT</u>

Baptiste, Louis, J., Esq.

Boehringer, Michael, Esq.

Dunlap & Shipman, P.A.

J.W. Cheatham LLC

J.W.C. Holdings, Inc.

Jennings, Jerry

Pollard PLLC

Pollard, Jonathan, Esq.

Prater, Christopher S., Esq.

Reinhart, Hon. Bruce, United States Magistrate Judge

Rosenberg, Hon. Robin L., United States District Judge

Scarpone, Kayla, Esq.

Webster, Stephen, Esq.

Webster + Baptiste Attorneys at Law, PLLC

Pursuant to 11th Cir. R. 26.1-3, Appellant Jerry Jennings certifies that no publicly traded company or corporation has an interest in the outcome of this appeal.

## STATEMENT REGARDING ORAL ARGUMENT

Appellant believes that this appeal can be resolved on the papers.

## <u>TABLE OF CONTENTS</u>

CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT .....................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ...............................................i

TABLE OF CONTENTS...........................................................................................ii

TABLE OF CITATIONS .......................................................................................iv

STATEMENT OF JURISDICTION ...................................................................... vii

STATEMENT OF THE ISSUES ...........................................................................1

STATEMENT OF THE CASE.................................................................................3

    A.    Course of Proceedings and
          Disposition in the Court Below........................................................3

    B.    Statement of the Facts ...................................................................4

          1.  Incident 1 (Appellant and his Wife Report
              Racial Discrimination) ..........................................................5

          2.  Incident 2 (Amid Escalating Racial Animus,
              Appellant is Relocated) .......................................................7

          3.  JWC's Conflicting Version of Incidents 1 and 2 ................9

          4.  Incident 3 (Appellant is Terminated after
              his Superior Calls Him a "Dumb Nigger") .........................10

    C.    Standard of Review.....................................................................13

SUMMARY OF THE ARGUMENT .....................................................................13

ARGUMENT AND CITATIONS OF AUTHORITY ...........................................16

    I.         The District Court did Not Apply Rule 56 .........................................16

II.     The Order Misinterprets the Purpose of 42 U.S.C. § 1981 ...................18

III.    Appellant's Claims Survive Rule 56 Under Theories
        of Direct or Circumstantial Evidence.......................................21

        A.     Direct Evidence of Discrimination ..............................................21

        B.     Circumstantial Evidence of Discrimination.................................22

IV.     The Order Erred in Granting Summary
        Judgment as to Retaliation ........................................................24

V.      Genuine Disputes of Facts Preclude a Conclusion
        that JWC's conduct was not Pretextual.....................................26

VI.     The Order Erred in Concluding that Genuine
        Disputes of Material Facts Did Not Preclude
        Summary Judgment as to Causation .........................................28

VII.    Genuine Disputes of Material Fact Precluded
        Summary Judgment as to Punitive Damages...........................29

CONCLUSION.....................................................................................32

CERTIFICATE OF COMPLIANCE......................................................32

CERTIFICATE OF SERVICE ...............................................................32

# <u>TABLE OF CITATIONS</u>

<u>CASES</u>

*Alphin v. Sears-Roebuck & Co.,*
    940 F.2d 1497 (11th Cir. 1991) .................................................................18

*Ash v. Tyson Foods, Inc.,*
    546 U.S. 454 (2006)........................................................................................28

*Bostock v. Clayton Cnty., Georgia,*
    590 U.S. 644 (2020)........................................................................................28

*Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media,*
    589 U.S. 327 (2020)........................................................................................16

*Earley v. Champion Intern. Corp.,*
    907 F.2d 1077 (11th Cir. 1990) .................................................................22

*Env't Def. Fund v. Marsh,*
    651 F.2d 983 (5th Cir. 1981) .......................................................................17

*Ferrill v. Parker Group, Inc.,*
    168 F.3d 468 (11th Cir. 1999) ...................................................................29

*Goldsmith v. Bagby Elevator Co., Inc.,*
    513 F.3d 1261 (11th Cir. 2008) .............................................................25, 31

*Goldsmith v. City of Atmore,*
    996 F.2d 1155 (11th Cir.1993) .................................................................25

*Jenkins v. Nell,*
    26 F.4th 1243 (11th Cir. 2022) .................................................................13

*Kolstad v. American Dental Ass'n,*
    527 U.S. 526 (1999)........................................................................................29

*Lewis v. City of Union City,*
    934 F.3d 1169 (11th Cir. 2019) .............................................................13, 22

iv

*McDonnell Douglas Corp. v. Green,*
    411 U.S. 792 (1973)........................................................................23

*Merritt v. Dillard Paper Co.,*
    120 F.3d 1181 (11th Cir. 1997) ....................................................22

*Miller v. Kenworth of Dothan, Inc.,*
    277 F.3d 1269 (11th Cir. 2002) ....................................................29

*Nunez v. Superior Oil Co.,*
    572 F.2d 1119 (5th Cir. 1978) ......................................................17

*Raney v. Vinson Guard Serv., Inc.,*
    120 F.3d 1192 (11th Cir. 1997)......................................................25

*Tynes v. Florida Dept. of Juvenile Justice,*
    88 F. 4th 939 (11th Cir. 2023)................................................16, 22

<u>STATUTES</u>

28 U.S.C. § 1291 .......................................................................... vii

28 U.S.C. § 1331 .......................................................................... vii

42 U.S.C. § 1981 ...........................................vii, 3, 16, 18, 20-21, 24, 26

The Civil Rights Act of 1866.................................................... 14, 19-20

<u>RULES</u>

Fed. R. Civ. P. 56 ......................................................................... 1, 15-18

Fed. R. App. P. 4.......................................................................... vii

Fed. R. App. P. 32.........................................................................32

<u>PATTERN JURY INSTRUCTIONS</u>

11th Cir. Pattern Jury Instr. 3.3...............................................................23

<u>SECONDARY SOURCES</u>

Cong. Globe, 39th Cong., 1st Sess., 43, 599 ...........................................19

Eric Foner, <u>Reconstruction: America's Unfinished Revolution 1863-1877</u>, (Updated Ed., Harper Perennial 2014 (1988) ................................................... 19-20

## <u>STATEMENT OF JURISDICTION</u>

The District Court had subject matter over this action because Appellant's claims arise under 42 U.S.C. § 1981. 28 U.S.C. § 1331. This Court has jurisdiction over this appeal from an order granting summary judgment. 28 U.S.C. § 1291. The District Court's summary judgment order was issued on July 8, 2024 and a notice of this appeal was timely filed on July 29, 2024. Fed. R. App. P. 4(a)(1)(A). D.E. 49.

## STATEMENT OF THE ISSUES

1.  Did the District Court err in granting summary judgment against Jennings on his claims for racial discrimination and retaliation?

2.  Did the District Court fail to properly apply Rule 56 with respect to its analysis of factual and credibility disputes between the parties and its application of relevant law to the facts and disputes in this case?

3.  Could a jury infer intentional discrimination and retaliation from the record (including factual and credibility disputes)?

4.  Did the District Court err in drawing its own factual inferences against Jennings at the summary judgment stage that should be left to the jury?

5.  Did the District Court err in failing to address properly articulated arguments, evidence, and legal precedent presented by Jennings regarding his discrimination and retaliation claims?

6.  Did the District Court err in concluding that Jennings lacked direct evidence to support his claims of discrimination and retaliation?

7.  Did the District Court err in concluding that Jennings failed to establish a *prima facia* case for racial discrimination and retaliation?

8.  Did the District Court err in concluding that Jennings was required to and also failed to identify a comparator?

9.      Did the District Court err by failing to conclude that under the totality of the circumstances, circumstantial evidence in the record precluded summary judgment as to Jennings claims for discrimination and retaliation?

10.      Did the District Court err by failing to conclude that genuinely disputed facts as to the causation of Jennings' termination precluded summary judgment?

11.      Did the District Court err in determining that a reasonable fact finder could not conclude that the reason for Jennings' termination was pretextual.

12.      Do genuinely disputed facts preclude the District Court's conclusion that Jennings' termination was non-discriminatory?

13.      Did the District Court err in granting summary judgment "for the reasons set forth in Defendant's Motion,[] which the Court adopt[ed] and incorporat[ed]" into the Summary Judgment Order?

14.      Did the District Court err in concluding that Jennings is precluded from seeking punitive damages for his claims of racial discrimination and retaliation?

## **STATEMENT OF THE CASE**[1]

### **A.** **Course of Proceedings and Disposition in the Court Below**

On July 3, 2023, Jennings filed a two-count lawsuit in the United States District Court for the Southern District of Florida against his former employer, JWC, for racial discrimination in violation of § 1981 and retaliation in violation of § 1981. D.E. 1 at pp.4-5.[2]

On May 15, 2024, JWC filed a motion for summary judgment ("**Motion**"). D.E. 36. Appellant filed his response in opposition to the Motion and JWC's statement of material facts on April 29, 2024. D.E. 41-42. On June 7, 2024, the District Court entered a paperless order requiring Defendant to file "a reply in support of its motion for summary judgment." D.E. 45. JWC filed its "Reply to Plaintiff's Response in Opposition to Defendant's Statement of Facts & Additional Facts" on June 19, 2024. D.E. 46.

---

[1] Plaintiff Jerry Jennings is "**Jennings**" or "**Appellant**." Defendant JW Cheatham LLC is "**JWC**" or "**Appellee**."

[2] Citations to the record are to the Document numbers generated by the District Court's electronic filing system the page(s) of each Document as follows: "**D.E. __ at __**." All cited Documents are contained in the Appendix to Appellant's Principal Brief, which consists of four (4) volumes.

In accordance with 11th Cir. R. 28-5, deposition citations are to the page number that appears in the header generated by the District Court's electronic filing system, not the page numbers assigned by the court reporters. The District Court system generated page numbers are different from the court reporter page numbers in D.E. 46-1 and 46-2 through 46-6.

3

On July 8, 2024, the District Court entered an order granting JWC's motion in full ("**Order**"). D.E. 47. On July 17, 2024, the District Court entered the judgment. D.E. 48. On July 29, 2024, Appellant timely filed his notice of appeal. D.E. 49.

### B. Statement of the Facts

Jennings was hired by JWC in January 2021 as a concrete finisher, a trade he has practiced for many years. D.E. 35-1 at 52:5-9, 53:16-22, 25:6-21. Appellant, who is over 50, testified that from his first day on the jobsite his white foreman, Anthony "Cotton" Propst ("**Foreman Propst**") called him "black, boy, never once my name." D.E. 35-1 at 55:15-12; D.E. 35-2 at 66:5-8. That was only the beginning. Among other things, Appellant testified he was the brunt of racially offensive and discriminatory statements nearly every day from his superior, Foreman Propst. He was:

- Called:
    - "nigger"
    - "boy"
    - "monkey"
    - "white mouth mule with nigger teeth."
- Told:
    - "I can wash my black off, you can't"
    - "black people have extra muscles"

- o "[I] wish I was back in the civil war days"

- o "black lives don't matter" and

- o "black men do not have a place in the presidency."

- Asked:

  - o "can you read?" and

  - o "can you count?"

D.E. 35-1 at 58:7-59:4, 108:1-13. While standing alone these statements are appalling, Appellant's primary focus is on three incidents involving his superiors (and their superiors).

### 1. Incident 1 (Appellant and his Wife Report Racial Discrimination)

Appellant frequently confided in his wife, Jessica Lovett-Jennings ("**Ms. Lovett-Jennings**") about the racism he was experiencing on JWC jobsites and from his Foreman Probst. D.E. 41-1 at 29:6-17, 30:12-22, 32:2-7, 34:12-35:13, 36:3-12. Ms. Lovett-Jennings recognized the toll that the daily abuse was having on her husband (*see, e.g., id*. at 18:6-19:1) and reached out directly to Mike Damron ("**Mr. Damron**") unbeknownst to Appellant (*id*. at 58:12-60:12, 68:6-8).

Mr. Damron is an owner of JWC. D.E. 35-2 at 13:23-14:13. He is also JWC's Vice President, CFO, Head of Human Resources, and "EEO officer." *Id*. at 14:16-15:18, 19:9. Ms. Lovett-Jennings told Mr. Damron in no uncertain terms, the slurs and discriminatory conduct Appellant was being subjected to:

> I remember me calling Mr. Mike [Damron] and telling him -- at first, I couldn't get him . . .  He called me back. … And so when I mentioned it was about [Appellant] on the job, [that Appellant] loved his job, but the, the, the racist comment, [Mr. Damron] said: What do you mean by racist comments? I said, they're calling him saying that he got assed in the face by a mule; the, the, teeth; being called the 'n' word." That – [Mr. Damron] pretty much said that they didn't tolerate that type of behavior on the job and that he would handle it. And I said, that [Appellant] do[es] not know that I'm calling you; [Appellant] told me that he did not want me to get involved. I said: but I'm calling you because he likes his job . . .  And [Mr. Damron] said that he would handle it in a way that nobody knows that, that, that what he's saying is coming from [Appellant].

D.E. 41-1 at 67:9-68:14; *see also* 58:12-60:23 (Ms. Lovett-Jennings describing the call with Mr. Damron including, "[Appellant] love this job, I said, but he can't take the racist comments that they're saying to him about that a mule assed in his face and that's why he got freckles. Being called the 'n' word, about his muscles and all of that. And [Mr. Damron] say: Well, first of all, I would like to say we, we do not allow such behavior. And so I said: Well, I understand that, Mr. Mike [Damron], but I say that's what's going on . . . And he's going through this every day. And he didn't want to come to you guys.  . . . [Mr. Damron] said: I can address it.").

When Appellant learned about the call, he was upset, believing things would be made worse for him on the job site. *Id*. at 68:20-69:1. His wife assured him that, based on her conversation with Mr. Damron, the issues would be addressed. *Id*. at 69:1-4.

6

Jody Brooker ("**Superintendent Brooker**"), white, is the superior of Foreman Propst and Foreman Wayne Seymour ("**Foreman Seymour**"). D.E. 35-2 at 57:25-58:2; D.E. 41-6 at 19:1-4. Appellant testified that shortly after his wife's call with Mr. Damron, Superintendent Brooker picked him up from a job site where he was working and took him to Mr. Damron's office. Appellant testified that he specifically told Mr. Damron that Foreman Propst was calling him "nigger." D.E. 35-1 at 63:3-65:2. Appellant, like his wife, was assured by Mr. Damron that something would be done. *Id*. at 65:14-23. Nothing was.

### 2. Incident 2 (Amid Escalating Racial Animus, Appellant is Relocated)

After those communications with Mr. Damron, as Appellant had feared, his treatment by Foreman Propst, worsened. D.E. 35-1 at 67:14-68:1. Other employees also directed racial slurs towards Appellant with impunity. For example, a non-black employee named Ray Oseguera would greet Appellant in the mornings with "what's up my nigger?" *Id*. at 108:22-109:8; D.E. 41-6 at 31:22-32:1. Plaintiff did not want trouble. D.E. 35-1 at 67:14-68:17, 69:7-13. He could not afford to quit, even though he thought about it daily as a direct result of his treatment. D.E. 35-1 at 56:10-15. But there is only so much that one man can take. One morning, after Mr. Oseguera greeted Plaintiff by calling him "nigger," Appellant spoke up, telling Mr. Oseguera not to use that word. D.E. 35-1 at 70:9-71:3. Foreman Propst, who was present, piped up stating that Mr. Oseguera "didn't say the word nigger." *Id*. Appellant asked

7

Foreman Propst what *he* had just said, and Foreman Propst responded: "I don't say the word nigger, I tell nigger jokes." *Id*. at 70:24-71:3. Things escalated. Mr. Oseguera prodded at Appellant with a bull float.[3] *Id*. at 71:4-11. Appellant knocked the bull float away and picked up a shovel to defend himself. *Id*. Mr. Oseguera backed off. *Id*. Shortly after this interaction, Foreman Probst called Superintendent Brooker, who came and picked Appellant up again. *Id*. Mr. Oseguera continued working. *Id*.

During his ride back to JWC headquarters with Superintendent Brooker, Appellant told him that Foreman Propst had continued to racially harass him. *Id*. at 72:9-16 ("I told him, [Foreman Probst] still saying – he doing the same doggone thing. So [Superintendent Brooker] told me, Well, we got to move you for a couple of weeks and I'm going to have a talk with [Foreman Probst]. And I said, I thought you-all were going to do that before. He never did respond."); 73:15 ("[Appellant] told [Superintendent Brooker], … [Foreman Propst's] been doing the doggone thing he done the first time. That's what the problem is, him and [Mr. Oseguera]. This time [Foreman Propst] got [Mr. Oseguera] involved."). Appellant was then moved to a different crew, under Foreman Seymour. *Id*. at 72:16-19.

---

[3] A bull float a tool used to level concrete, comprised of a wide metal sheet approximately four feet by eight inches affixed by a hinge to a hand-held pole.

### 3. JWC's Conflicting Version of Incidents 1 and 2

Foreman Propst denies racial language was used, as is to be expected (although he admits that Mr. Oseguera had a tool with a metal blade in his hand during the interaction with Appellant). *See, e.g.,* 41-6 at 29:17-22, 41:19-42:6. But there are far more fundamental factual disputes regarding the events described above.

First, while Mr. Damron admitted to speaking to Appellant and his wife about Appellant's workplace discontent, Mr. Damron testified that neither ever explicitly referred to race as the source of that discontent (even though his May 6, 2021 "Accident Summary" report says Appellant's wife "called in insinuating that there is some type of racial issue happening."). D.E. 35-2 at 60:2-63:8, 66:20-24, 69:18-23; D.E. 35-3 at 4. Second, in Mr. Damron's version of events, there were not two incidents but one. That is, Mr. Damron testified that he moved Appellant from Foreman Propst's crew to Foreman Seymour's crew immediately after the call from Appellant's wife, his conversation with Appellant, and a conversation with Foreman Propst and Mr. Oseguera. D.E. 35-2 at 65:21-25, 68:18-23. That is false.

Strangely, Mr. Damron claims he made the decision "to move [Appellant] from [Foreman Propst's] crew to [Foreman Seymour's] crew because Andre Excellent, *who is Black* and has worked for me for six, seven years . . . so if there was anything going on and no one wants to say anything it would make more

sense for me to put him with Andre because Andre's never complained about anything the whole time he's been here." *Id*. at 63:18-64:4 (emphasis added). Despite JWC's efforts to muddy the record, there is no genuine dispute that racial issues were the source of Appellant's issues on the job site and Mr. Damron knew it once he spoke to Ms. Jennings-Lovett.

### 4. Incident 3 (Appellant is Terminated after his Superior Calls Him a "Dumb Nigger")

On January 25, 2022, Appellant was working on a site along Wallis Road in West Palm Beach, Florida with Foreman Seymour's crew. A question arose about to how to work on a specific troublesome patch of concrete. *Id*. at 74:6-25. Appellant testified that he made a suggestion to Foreman Seymour about how to deal with the problem. *Id*.  Foreman Seymour rejected the suggestion, stating replied "I'm not no dumb nigger." *Id*.; *see also id*. at 76:9-13. It is undisputed that Foreman Seymour used the word "nigger" during this interaction (despite his initial denials of same during his deposition). D.E. 41-4 at 72:4-17. It is undisputed that the two men did not become physically aggressive, beyond Foreman Seymour's throwing Appellant's toolbelt and getting in Appellant's face. D.E. 35-1 at 74:5-75:5, 76:9-77:2, 77:25-78:10. It is undisputed that Foreman Seymour left the jobsite immediately and that Appellant was sent home from work. *Id*. It is undisputed that other crew members were multiple feet away when the incident began. *Id*. at 104:1-6. Robert Rose, another JWC employee on the job site, testified that he overheard

Appellant saying to Foreman Seymour that Foreman Seymour had called him the n-word. D.E. 41-3 at 39:9-12. Rose further testified that he witnessed Foreman Seymour throw Appellant's toolbelt to the ground. *Id*. at 40:25-41:3.

Foreman Seymour's version of events, as relayed to Mr. Damron, were that Foreman Seymour had been called the 'n' word by *Appellant*, to which Foreman Seymour responded that "I'm not *the* "N' word[.]" D.E. 35-2 at 83:18-19, 84:14-15 (emphasis added); D.E. 41-4 at 72:11-15. It is not disputed that Foreman Seymour was never disciplined for his use of the slur towards his subordinate. D.E. 35-2 at 100:3-14.

Foreman Seymour's version of events are further called into question by his depositions testimony, in which he initially denied saying *anything* to Appellant during this exchange (D.E. 41-4 at 64:16-20), before admitting to using the 'n' word during the exchange (*id*. at 71:11-15).

Prior to this incident, Foreman Seymour had been disciplined and coached for "the way he handles himself," including "yelling" at subordinates. D.E. 35-2 at 78:13-19. Superintendent Brooker also testified that he has witnessed such behavior, has received and otherwise been made aware of multiple complaints about Foreman Seymour's inappropriate, aggressive, and belittling conduct towards subordinates on jobsites, and that he stands very close to people when talking. D.E. 41-5 at 34:24-37:25, 39:20-40:12, 41:1-10; *see also* D.E. 35-2 at 78:13-19.

Mr. Damron prepared an incident report in connection with the January 2022 incident. D.E. 35-3 at 6-7. That report has proven to be false in multiple respects. First, JWC's counsel confirmed that, despite Mr. Damron writing in the report that he obtained written and signed statements from other employees (Messrs. Excellent and Rose), no such statements were obtained. D.E. 35-3 at 6-7; D.E. 41-2. Second, the report also contains demonstrably false statements about what Mr. Rose said happened. Specifically, Mr. Damron claims that Mr. Rose reported the same things that another witness, Andre Excellent said (D.E. 35-3 at 7), but Mr. Rose's testimony disputes that version of events. *See* D.E. 41-3 at 42:21-43:1, 43:4-23, 50:20-51:16 (testifying he never gave a written or signed statement and only told Mr. Damron that it was a heated discussion and that both had bad attitudes). Third, despite Mr. Damron testifying that he never spoke to Appellant about the incident, he wrote in the remarks section of the incident report that there was a "False Report". D.E. 35-3 at 7. It is unclear whose 'report was rendered false based on Mr. Damron's own version of what he was told and his testimony that he never got a statement from Appellant about the incident. D.E. 35-2 at 98:24-99:7.

Regardless, we know Appellant spoke on the phone Mr. Damron the next day. D.E. 35-1 at 106:2-9; D.E. 35-2 at 87:11-13. Without inquiring into Appellant's version of events, Mr. Damron told Appellant that he was fired. D.E. 35-1 at 106:2-

9. Appellant responded to Mr. Damron, stating so "I'm being terminated for someone calling me a dumb nigger." D.E. 35-1 at 106:2-9.

### C. <u>Standard of Review</u>

This Court reviews de novo the District Court's grant of summary judgment, viewing all evidence and drawing all reasonable factual inferences in favor the nonmoving party. *Jenkins v. Nell*, 26 F.4th 1243, 1249 (11th Cir. 2022) (citing *Lewis v. City of Union City,* 934 F.3d 1169, 1179 (11th Cir. 2019) (*Lewis II*).

## <u>SUMMARY OF THE ARGUMENT</u>

The Order opens with the conclusion that "[t]his case is about a fight." This case is not about a fight. This case is about America and the laws this nation passed in the aftermath of the Civil War. Jerry Jennings is a black man from Tennessee who worked as a concrete finisher in and around West Palm Beach, Florida for a company called J.W. Cheatham LLC. In South Florida, relatively few concrete finishers are native-born Americans. It is a tough job and a job that is done mostly by immigrants. But Jennings did not mind hard work. He did mind being called a nigger, a mule with nigger teeth, and subjected to racist harassment on a near-daily basis. When his wife saw the toll that this racism was taking on her husband, she called JWC's office to complain on her husband's behalf. An owner of the Company and human resources officer, Mr. Damron, promised that something would be done. But the Company did nothing. Months went by. The harassment continued and got worse.

Eventually, JWC moved Mr. Jennings to work primarily under a different foreman, Foreman Seymour.

One day, Jennings suggested how to perform a certain task on a stretch of concrete. Foreman Seymour stated that he would not follow Jennings' suggestion because, "I'm not no dumb nigger." Jennings objected to this and was sent home from work. The next day, Jennings reached out to Mr. Damron, who advised that Jennings was fired. On these facts, the District Court granted summary judgment. In its Order, the District Court opined that this case is really just about a fight. In its Order, the District Court explicitly stated that it adopted all the arguments raised in JWC's summary judgment briefing. In its Order, the District Court failed to address the circumstantial evidence supporting Appellant's claims, focusing instead on whether he identified an adequate comparator. All of this was in error.

What happened to Jerry Jennings at his job is an outrage. America has made tremendous progress on matters of race. But there remain pockets of vicious and strident racism. In the aftermath of the Civil War, black men in the South like Jennings relied upon the federal government and the federal courts to protect both their lives and their right to earn a livelihood. The Civil Rights Act of 1866 is still good law. Federal courts must faithfully apply that law. In this case, the District Court wholly abandoned that duty.

14

This is a common problem that usually goes uncorrected because of basic economics. Trial courts improperly grant summary judgment in employment discrimination cases with tremendous frequency. So, plaintiffs' lawyers in those cases encourage their clients to settle early for a fraction of the real value of the case. In the rare case where a lawyer and client are true believers and willing to go the distance, the trial court often resolves all factual disputes in favor of the defendant and grants summary judgment. At that point, the defendant obtains a costs judgment. Here, JWC is seeking more than $3,500 in costs and has already threatened to garnish Jennings' modest wages. That would normally be the end of it and the plaintiff would capitulate. But, here, the undersigned law firm will pay for a bond to prevent JWC from collecting any judgment against Jennings. Because that is what justice demands be done. Jerry Jennings has real claims, and he deserves the chance to present his case to a jury.

First, the District Court erred by not applying Rule 56. There is no heightened version of Rule 56 that applies only in employment discrimination cases. The errors compound from there: Appellant demonstrated (a) triable claims on theories of either direct or circumstantial evidence for both of his claims, (b) that genuine disputes of material fact precluded a determination one way or another regarding the pretextual nature of his firing, (c) that a jury must determine whether his race is the cause of his treatment and ultimately his termination, and (d) demonstrated that his

15

entitlement to punitive damages is a question for the jury. By starting from a faulty foundation, the Order erred throughout.

## ARGUMENT AND CITATIONS OF AUTHORITY

### I.    The District Court did Not Apply Rule 56

The District Court did not apply Rule 56. That was in error. Many employees with workplace grievances have exactly that: just a grievance. People throw around words like harassment, discrimination, and hostile work environment over the most minor of slights. Recognizing this, federal courts have sought to reign in and dispose of discrimination cases. But many federal courts have gone too far. They have abandoned Rule 56 in favor of something else. They have created a new framework that applies only in employment discrimination cases. That framework fairly cannot be called Rule 56. It is not an interpretation of Rule 56 or even a heightened Rule 56. It bears no resemblance to Rule 56.

Rule 56 governs all federal civil cases. There is no exception for employment discrimination cases. *See Tynes v. Florida Dept. of Juvenile Justice*, 88 F. 4th 939, 947 (11th Cir. 2023) (discussing the convincing mosaic standard and stating that summary judgement works the same way in employment discrimination cases as it does in all other cases); *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 589 U.S. 327, 341 (2020) ("[T]he traditional tools of statutory interpretation persuade us that § 1981 follows the usual rules, not any exception. To prevail, a

plaintiff must initially plead and ultimately prove that, but for race, it would not have suffered the loss of a legally protected right.").

The text of Rule 56 provides that summary judgment is only appropriate when there is "no genuine dispute as to any material fact." The District Court maintains that Jennings was fired because of a fight. D.E. 47 at 1. Rule 56 prevents the District Court from reaching that conclusion. There are two drastically different versions of the incident in question (and neither of those versions claim there was an actual fight). Jennings testified that Foreman Seymour called him a "dumb nigger", an argument ensued, and Foreman Seymour dumped all of Jennings tools out of his tool belt. D.E. 35-1 at 76:9-77:2, 77:25-78:10. Foreman Seymour testified that Jennings went crazy and started screaming the 'n' word at *him*. D.E. 41-4 at 62:8-12. The critical incident here is contested. The trial court is not at liberty to choose one version of events over the other. But that is exactly what the District Court did.

Surviving summary judgment is not intended to be some herculean task. To the contrary: The party moving for summary judgment "must meet an exacting standard." *Env't Def. Fund v. Marsh*, 651 F.2d 983, 990–91 (5th Cir. 1981). Even where there is no dispute over material facts, but the inferences could be debated, summary judgment must be denied. *See Nunez v. Superior Oil Co.*, 572 F.2d 1119, 1124 (5th Cir. 1978) (calling summary judgment a "lethal weapon" susceptible to "overkill" and admonishing that inferences and credibility determinations go to the

17

jury). Here, not only are the facts disputed, but so too are inferences and credibility determinations. A jury could reasonably conclude that Jennings was terminated on account of his race and for complaining about being treated differently (terribly) because of his race. In other words: If Jennings was white, we would not be here. The District Court's wholesale adoption of JWC's version of events, explicit embrace of every argument JWC raised, resolution of all credibility determinations in JWC's favor, and drawing of all inferences in JWC's favor is fundamentally inconsistent with Rule 56. On this basis alone, the District Court's decision should be vacated.

## II.    The Order Misinterprets the Purpose of 42 U.S.C. § 1981

Corporate defendants routinely cite this Circuit's language that the trial court does not sit "as a super-personnel department that re-examines an entity's business decisions." *Alphin v. Sears-Roebuck & Co.,* 940 F.2d 1497, 1501 (11th Cir. 1991). The District Court embraced that logic here. D.E. 42 at 9; D.E. 47 at 6. But Appellant did not ask it to second guess JWC's business judgments. Instead, Appellant asked the District Court to apply the law. This widely-cited language from *Alphin* (an ADEA case that has subsequently crept into all forms of employment discrimination litigation) must be reconciled with settled law that pre-dates the holding by more than 100 years. *Alphin* does not create a new standard or a proverbial get-out-of-jail free card.

18

The Civil Rights Act of 1866 ("**Act**")[4] arose from the post-civil war realities of the XIII Amendment. Millions of American blacks suddenly constituted a "large class barred from equal access to the courts and full participation in the marketplace," in contravention of the "fundamental principles of [] free labor ideology." Eric Foner, <u>Reconstruction: America's Unfinished Revolution 1863-1877</u>, p.208 (Updated Ed., Harper Perennial 2014 (1988). Reconstruction Republicans of the time debated amongst themselves on the scope of reconstruction based on their varying degrees of radicality. But the more moderate wing (like the Act's author Sen. Lyman Trumbull, *id*. at 241) were focused primarily on protecting "rights essential for blacks to enter the world of contract, to compete on equal terms as free laborers." *Id*. at 244; *see also id*. (reconstruction Congressman surmising the Act as an attempt to "secure to a poor, weak class of laborers the right to make contracts for their labor, the power to enforce the payment of their wages, and means of holding and enjoying the proceeds of their toil." (citation omitted)); *see also* Cong. Globe, 39th Cong., 1st Sess., 43, 599 (Sen. Trumbull describing the Act as an attempt to "give effect to [the XIII Amendment] and secure to all persons within the United States *practical* freedom. There is very little importance in the general declaration of abstract truths and principles unless they can be carried into effect,

---

[4] Long Title: An Act to protect all Persons in the United States in their Civil Rights and liberties, and furnish the Means of their Vindication. 39th Cong., Sess. I, Ch. 31 (1866).

unless the persons who are to be affected by them have some means of availing themselves of their benefits.") (emphasis added).

42 U.S.C. § 1981 is and always has been predicated on the understanding that American laborers of all colors must be allowed to freely compete with one another. From day one, the chief vehicle through which Congress intended for people to avail themselves of the benefits described by Trumbull above was the federal court system. Reconstruction at 258 (describing Congressional reliance upon federal judiciary for civil rights enforcement).

42 U.S.C. § 1981 has been left virtually undisturbed for nearly 160 years. The only major revision to it was the Civil Rights Act of 1991, which represented a Congressional response to federal courts attempting to curb § 1981's breadth.

The 39th Congress (1865-1867) understood that those with the least labor power are simultaneously those who most need the protections of the federal judiciary. Although a properly functioning labor market required the incorporation of blacks into the workforce after 1865, the Act was not *solely* about efficiency and economy. The Act is also built upon a belief that Americans should be afforded dignity and a semblance of equality when selling their labor. JWC deprived Appellant of that dignity, solely because of his race. *See, e.g.,* D.E. 35-1 at 13-20 (Appellant describes working at JWC as causing him to feel "less than a man. Depressed. Useless … I kind of feel that way now. I'm nervous about what I do . . .

it seemed like I couldn't do anything right."). But despite all of this, Jennings did not quit JWC. He needed the job. As exemplified in his wife's articulation of the situation:

> I mean, the stuff that [Jerry] went through with his supervisors, that wasn't good. I wouldn't wish that on nobody. But I still wouldn't quit, me as a woman. Everybody don't think like me; I wouldn't quit. Especially if I know that I, I haven't did anything. Then you don't quit. You keep going. And he did that. He kept going.

D.E. 41-1 at 20:9-16. Appellant does not seek special treatment. He does not ask any court to meddle in the legitimate business decisions of JWC or industry at large. Instead, Appellant asks this Court to uphold his right to earn a living in America without facing disparate treatment on account of his race. On this record, Appellant should be afforded the protections of § 1981 and be allowed to present his case to a jury.

### III.  Appellant's Claims Survive Rule 56 Under Theories of Direct or Circumstantial Evidence

Contrary to the Order's conclusion, Appellant advanced triable theories of both direct and circumstantial evidence.

#### A. Direct Evidence of Discrimination

Let us momentarily agree with the Order's synopsis of this case: That it is "about a fight." D.E. 47 at 1. What was that 'altercation at the heart of this case' about? *Id*. at 4. Appellant testified that he offered a solution to an issue with concrete on a jobsite. His suggestion was rejected out-of-hand by his boss because, unlike

Appellant, his boss was not a "dumb nigger." Absent inference, the sole interpretation of this evidence is that JWC discriminated against Appellant's ability to perform his job solely because of his race. There is no meaningful difference in this statement and the oft-cited example of direct evidence from *Earley* ("Fire Earley—he is too old."). *See Earley v. Champion Intern. Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990). Further, slurs of this kind (and those made by Foreman Propst) have routinely been held to constitute direct evidence in discrimination cases. *See, e.g., Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997) (collecting cases).

### B. Circumstantial Evidence of Discrimination

Summary judgment is improper where disputes over facts and credibility could allow a jury to infer intentional discrimination. The convincing mosaic approach may look to, among other things, "suspicious timing, ambiguous statements …, and other bits and pieces from which an inference of discriminatory intent might be drawn" and "evidence that the employer's justification is pretextual." *Lewis*, 934 F.3d at 1185; *see also Tynes*, 88 F.4th at 947 ("[W]e look beyond the prima facie case to consider all relevant evidence in the record to decide the ultimate question of intentional discrimination."). In other words, the true question is whether circumstantial evidence exists that could allow a reasonable jury to infer intentional

discrimination. *See, e.g.,* 11th Cir. Pattern Jury Instr. 3.3 ("'Circumstantial evidence' is proof of a chain of facts and circumstances that tend to prove or disprove a fact.).

Despite this, the Order is overly concerned with a comparator—or lack thereof.[5] While a mosaic is not directly mentioned, the Order claims that a comparator is required for Appellant's claims to survive where no other evidence of discrimination and pretext is present. D.E. 47 at 2, 7; *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). And while the Order adopted the conclusions of JWC's summary judgment briefing (D.E. 47 at 7), JWC also made no attacks on Appellant's arguments at summary judgment pertaining to a mosaic approach (despite Appellant addressing this theory and significant "other evidence of discrimination [that] is present" in his response brief (*see* D.E. 42 at 6-8)). *See* D.E. 47 at 2.

Turning to the convincing mosaic standard, the facts *supra* lay out a circumstantial tapestry that a reasonable jury could conclude exhibits intentional racial discrimination. *See supra* Statement of the Facts at § B (*e.g.,* D.E. 35-2 at 62:8-18 (Mr. Damron, Foreman Propst and Superintendent Brooker, deny that Appellant (or his wife) explicitly complained of racially charged statements prior to being

---

[5] Regarding the classical *McDonnell Douglas* comparator requirement: Mr. Oseguera was identified as a similarly situated employee. D.E. 42 at 8. Appellant testified that Mr. Oseguera directed slurs at Appellant without any repercussions. D.E. 42 at 8. As is clear, the overwhelming amount of racial animus and discriminatory conduct came from Appellant's superiors.

moved to Foreman Seymour's team); *id*. at 62:24-63:4:4 (Mr. Damron testified that when he met with Plaintiff, he only said that "people are saying things they shouldn't be saying" but Mr. Damron's proffered reason for moving Appellant to Foreman Seymour's team was because it had a black man on it); D.E. 35-1 at 67:14-68:1 (Appellant testified that after his meeting with Mr. Damron, the discriminatory treatment by Foreman Propst got "worse"); *id*. at 72:3-19, 73:5-22 (Appellant asked Superintendent Brooker why he hadn't been moved after his initial complaint)). Appellant was never questioned by Mr. Damron about what occurred in January 2022 and the decision to terminate him was made prior to Appellant calling Mr. Damron, who recorded false information about what occurred in the incident report, while simultaneously indicating that Appellant had made a "false report." D.E. 35-3 at 6-7; D.E. 41-2; D.E. 35-2 at 98:24-99:7.

Taking all reasonable inferences in Appellant's favor (a concept neither mentioned in the Order nor discernible in its conclusions), the District Court erred by failing to recognize that Appellant articulated a sufficient mosaic of circumstantial evidence to proceed to trial.

## IV.  **The Order Erred in Granting Summary Judgment as to Retaliation**

The Order did not separately analyze Appellant's retaliation claim, opting to incorporate its other findings and the adopting in whole "the reasons in [JWC's] Motion." DE 47 at 7, n.2. To establish a claim of retaliation under 1981, a plaintiff

must prove that he engaged in statutorily protected activity, he suffered a materially adverse action, and there was some causal relation between the two events. *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1277 (11th Cir. 2008) (citation omitted).

To satisfy the "causal link" prong of a *prima facie* retaliation case, a plaintiff must generally establish that the defendant was actually aware of the protected expression at the time the defendant took the adverse employment action. *Goldsmith v. City of Atmore,* 996 F.2d 1155, 1163 (11th Cir. 1993). As corporate defendants act through authorized agents, in a case involving a corporate defendant the plaintiff must show that the corporate agent who took the adverse action was aware of the plaintiff's protected expression and acted within the scope of his or her agency when taking the action. *Raney v. Vinson Guard Serv., Inc.,* 120 F.3d 1192, 1197 (11th Cir. 1997).

Here, there are at least three incidents of protected activity and no genuine dispute that JWC was aware of them all. First, Appellant's initial disclosure of Foreman Propst's racism to Mr. Damron. Second, Appellant's discussion of Forman Propst's continuing racism (which now included Mr. Oseguera's) with Superintendent Brooker. And third, Appellant's objection to being called a "dumb nigger" by Foreman Seymour. Regardless of Mr. Damron's conflation and downplaying of the first two incidents, JWC was certainly aware of Appellant's

complaints. With regard to the third incident, JWC—through Mr. Damron—was aware that at a minimum that a racial slur had been directed at Appellant. Despite this, Appellant was terminated without ever being given a chance to provide his side of the story and Mr. Damron attempted to cover his discriminatory tracks by falsifying the incident report record. D.E. 35-3 at 6-7; D.E. 41-2; D.E. 41-3 at 42:21-43:1, 43:4-23, 50:20-51:16.

The casual through-line, JWC's failure to reasonably address Appellant's complaints of racism, resulted in progressively worsening discriminatory treatment, culminating in JWC's decision to terminate Appellant after another egregious instance of racial discrimination was brought to its attention. A reasonable jury could infer that this termination was the result of Appellant's reporting of such conduct, as well as his objections to being called slurs and discriminated against by his direct superiors. In other words: that his termination was a violation of § 1981.

### V.  <u>Genuine Disputes of Facts Preclude a Conclusion that JWC's conduct was not Pretextual</u>

The Order impermissibly affords credence to Mr. Damron's version of events holding:

> The Plaintiff contends that his fellow employees lied to Mr. Damron, but he fails to persuade the Court that Mr. Damron's account of the employees' testimony is in dispute, particularly since the Plaintiff could have (and did) depose the employees. DE 41-3. Stated differently, to create a dispute of fact the Plaintiff could have cited testimony from a fellow employee that contradicted Mr. Damron's account of the employee's prior testimony, but the Plaintiff has not done so. Instead,

> the Plaintiff cites to the employees' depositions for the mere
> proposition that there is one inconsistency in Mr. Damron's records
> (indicating that he would/did get signed, written statements). The Court
> declines to conclude, based upon that one potential inconsistency, that
> there is a dispute of fact about whether the employees told Mr. Damron
> that the Plaintiff was at fault for the altercation. Instead, the record is
> clear—Mr. Damron was told (even if it was falsely) that the Plaintiff
> was at fault for the altercation.

D.E. 47 at 7. That is, the District Court found that Mr. Damron was simply

responding to a workplace fight and JWC had a lawful basis to terminate Appellant.

But the situation surrounding Appellant's termination did not occur in a vacuum.

And Mr. Damron's falsified records and shifting testimony call his credibility into

serious question. D.E. 35-3 at 6-7; D.E. 41-2. Further, there is the fact that the only

person who became physical during the January 25, 2022 argument was Foreman

Seymour (again, a known hot-head) before storming off to report his version of

events to Mr. Damron. D.E. 35-1 at 76:9-77:2, 77:25-78:10. And Mr. Rose testified

he did not report to Mr. Damron what Mr. Damron claims. 41-3 at 42:21-43:1, 43:4-

23, 50:20-51:16. Mr. Damron's failure to ask Appellant a single question as to the

events—despite knowing that racial slurs were directed towards Appellant that day,

despite knowing of Appellant's prior complaints regarding Foreman Propst, and

despite Appellant's testimony that he told Mr. Damron that Foreman Seymour called

him a "dumb nigger" on the termination call—allow a reasonable jury to conclude

that any 'investigation' was merely a sham, a means to paper over legitimate

27

complaints of and experiences with workplace racism at the hands of Appellant's superiors.

## VI.  **The Order Erred in Concluding that Genuine Disputes of Material Facts Did Not Preclude Summary Judgment as to Causation**

Appellant's claims are held to a but-for causation standard. This means the factfinder must "change one thing at a time and see if the outcome changes. If it does, we have found but-for cause*." Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 656 (2020).

Were Appellant white, would he have been, as he testified, called "boy" by Foreman Propst? *See Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006) (holding that calling a black man 'boy,' absent specific reference to race, can be basis of discrimination claim, as a speaker's meaning may depend on various factors including context, inflection, tone of voice, local custom, and historical usage."). Would he have been required to continue working under Foreman Propst for months after he (and his wife) alerted an owner of the Company about the treatment he was experiencing? Would he have been called a "dumb nigger" by Foreman Seymour? Would he have been fired without anything resembling a proper investigation or so much as a chance to explain what happened? The answer is no.

It stands to reason that if Jennings was repeatedly called a nigger at work, repeatedly objected to being called a nigger at work, and was fired immediately after the last time he objected to being called a nigger at work that race could have been

the reason why JWC fired him. But by the District Court's logic, no reasonable jury could ever conclude that JWC fired Jennings because of his race or because he complained about unlawful racism. Instead, according to the District Court, the only possible conclusion that a jury could reach is that Jennings was properly fired over a fight. We should ask a jury.

## VII. <u>Genuine Disputes of Material Fact Precluded Summary Judgment as to Punitive Damages</u>

Punitive damages are not referenced in the Order. Appellant addresses them because of the Order's wholesales adoption of all points raised by JWC in its Motion. Appellant has proffered significant, substantial evidence that JWC acted with actual malice *or* reckless indifference to his federally protected rights. *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1280 (11th Cir. 2002) (citation omitted); *Ferrill v. Parker Group, Inc.*, 168 F.3d 468, 476 (11th Cir. 1999) (describing "malice" as an "intent to harm" and "recklessness" as "serious disregard for the consequences of [one's] actions.") (quotations omitted). "Malice or reckless indifference is established by a showing that the employer discriminated in the face of the knowledge that its actions would violate federal law." *Miller*, 277 F.3d at 1280 (citation omitted); *see also Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536 (1999) (describing employer liability for punitive damages where employer "discriminate[s] in the face of perceived risk that its actions will violate federal law.").

29

JWC chooses to allow Mr. Damron to run its human resources department, despite his limited of training in same. D.E. 35-2 at 33:23-37:4. Mr. Damron claims to be, among a litany of other things, JWC's "EEO officer." *Id*. 2 at 19:9. It is reasonable to expect that Mr. Damron is uniquely qualified to understand and address civil rights-related complaints of his employees. D.E. 46-1, JWC's Employee Handbook, at 17 (detailing equal employment opportunity policy and harassment policy prohibiting harassment on the basis of race). Genuine disputes as to Mr. Damron's conduct—including the falsifying of records, misrepresentation as to what was communicated to him by Appellant, his wife, and other JWC employees as well as his failure to inquire with Appellant about anything that occurred on January 25, 2022 (even after Appellant said "so I'm getting terminated for being called a dumb nigger"—precludes summary judgment on this issue. D.E. 35-3 at 6-7; D.E. 41-2; D.E. 41-3 at 42:21-43:1, 43:4-23, 50:20-52:16; D.E. 35-2 at 60:2-63:8, 66:20-24, 69:18-23; D.E. 35-3 at 4; D.E. 35-1 at 106:2-9.

Similarly, Foreman Seymour's evasive answers, i.e., initially denying that he used the 'n' word during his January 25, 2022 exchange with Appellant before admitting that at minimum he told Appellant that he (Seymour) was not "*the"* 'n' word indicate that Foreman Seymour was well aware that his behavior was not appropriate.

In a similar context, this Court has upheld a jury's punitive damages award because it was supported by an "inference of recklessness" based on, among other things, that superiors were "at best apathetic to [plaintiff's] civil rights despite [] knowledge that it was illegal to permit racial harassment in the workplace" and that "evidence suggested employees were not reprimanded for their utterance of racial slurs." *Goldsmith*, 513 F.3d at 1281. Mr. Damron similarly did nothing to separate Appellant from Foreman Propst for months (despite the fact that it was clearly a feasible solution). This, at best, demonstrates apathy towards Appellant's civil rights. When the situation boiled over again, Appellant was moved over racial epithets directed *towards him* by Mr. Oseguera and Foreman Propst. And yet, Foremen Propst and Seymour and Mr. Oseguera continued working without reprimand. Then, Appellant was fired over racial epithets directed *towards him*.

Appellant and his wife testified as to the pressure that the workplace treatment had on Plaintiff's family life, stemming largely from his feeling of powerlessness to leave a job that he desperately needed. D.E. 41-1 at 16:5-8, 18:6-19:11, 29:6-17, 30:12-22; D.E. 35-1 at 109:13-20. It is well established that emotional harm resulting in damaged family relationships and flowing from economic dependence on a job supports an ultimate finding of sufficient reprehensibility of JWC's conduct in the context of punitive damages. *Goldsmith*, 513 F.3d at 1281.

31

**CONCLUSION**

Jennings respectfully requests that this Court reverse the Order granting summary judgment.

By: */s/ Christopher S. Prater*
**CHRISTOPHER S. PRATER**
cprater@pollardllc.com
Florida Bar No.: 105488
**JONATHAN E. POLLARD**
jpollard@pollardllc.com
**POLLARD PLLC**
401 E. Las Olas Blvd. Ste. 1400
Fort Lauderdale, FL 33301
Telephone: 954-332-2380
*Attorneys for Appellant*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the word limit set forth Fed R. App. P. 32(a)(7)(B)(i) in that it contains 7472 words and complies with the typeface and style requirements because it is prepared in Times New Roman 14-point font. Fed. R. App. P. 32(a)(5)-(6), (g)(1).

By: s/ *Christopher S. Prater*
Christopher S. Prater

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on October 16, 2024, I electronically filed the foregoing with the Clerk of the Court via the CM/ECF system.

By: s/ *Christopher S. Prater*
Christopher S. Prater