No. 24-12443-F

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

---

JERRY JENNINGS,

*Plaintiff / Appellant,*

v.

J.W. CHEATHAM LLC,

*Appellee / Defendant.*

---

ON APPEAL FROM THE ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT AND JUDGMENT ENTERED
IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN
DISTRICT OF FLORIDA

No. 9:23-cv-80995-RLR

The Hon. Robin L. Rosenberg

---

**APPELLEE'S ANSWER BRIEF**

---

**Kayla M. Scarpone**

DUNLAP & SHIPMAN, P.A.
2065 Thomasville Road, Suite 102
Tallahassee, FL  32308-0733
850-385-5000
850-385-7636  Facsimile
kayla@dunlapshipman.com
julie@dunlapshipman.com
*Attorney for Appellee
J. W. Cheatham, LLC*

**No. 24-12443-F**

*JERRY JENNINGS v. J.W. Cheatham, LLC*

**Certificate of Interested Persons and Corporate Disclosure Statement**

Pursuant to 11th Cir. R. 26.1.1(a)(3), Appellee, J.W. Cheatham, LLC, through undersigned counsel, notices the persons and entities that may have an interest in the outcome of this case, in addition to those already included on Appellant's CIP in the Initial Brief:

TOMUCO LLC

TPU Holdings, Inc.

Tri-Carmichael Holdings Co.

Pursuant Fed. R. App. P. 26.1(a), the following entities are affiliated with and are members of Appellee, J.W. Cheatham, LLC:

J.W.C. Holdings, Inc.

TOMUCO LLC

TPU Holdings, Inc.

Tri-Carmichael Holdings Co.

There are no publicly traded companies that have an interest in the outcome of this appeal

## Statement Regarding Oral Argument

Appellee agrees this appeal can be resolved on the papers.

**Table of Contents**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ........................................................ C-1 of 1

STATEMENT REGARDING ORAL ARGUMENT ................................................. i

TABLE OF CONTENTS ........................................... ii

TABLE OF CITATIONS ............................................... iv

STATEMENT OF THE ISSUES ............................................. 1

STATEMENT OF THE CASE ............................................ 3

    (i)    Course of Proceedings and Dispositions in the Court Below .............. 3
    (ii)   Statement of Facts ............................................ 3
    (iii)  Standard of Review ........................................ 11

SUMMARY OF THE ARGUMENT ............................................ 13

ARGUMENT ......................................... 15

  A. The District Court Properly Granted Summary Judgment on Appellant's Disparate Treatment Claim ............................................ 15
     1. Standard for Evaluation of §1981 Claims ........................................... 15
     2. The District Court Correctly Found Appellant Failed to Present Direct Evidence to Support His Claims ....................................... 16
     3. The District Court Correctly Found Appellant Lacks a Valid Comparator ....................................... 17
     4. The District Court Correctly Evaluated the Evidence According to the "Convincing Mosaic"/Pretext Analysis .............................................. 20

  B. The District Court Properly Granted Summary Judgment on Appellant's Retaliation Claim .......................................... 32
     1. The District Court Properly Granted Summary Judgment on the Retaliation Claims Based on the Same Reasoning as under the Disparate Treatment Claim....................................... 32
     2. The Additional Arguments Advanced by JWC and Adopted by the District Court are Additional Bases for Summary Judgment in JWC Favor ................................................. 32

C. The District Court Did Not Need to Reach Appellant's Punitive Damages
   Claims ...........................................................................................................34

CONCLUSION ...................................................................................................35

CERTIFICATE OF COMPLIANCE .......................................................................35

CERTIFICATE OF SERVICE ...............................................................................36

# Table of Citations

## CASES

*Access Now, Inc. v. Sw. Airlines Co.,* 385 F.3d 1324 (11th Cir. 2004)..............18, 27

*Alphin v. Sears-Roebuck and Co.,* 940 F.2d 1497 (11th Cir. 1991) ........................29

*Anyanwu v. Brumos Motor Cars, Inc*., 496 F. App'x 943 (11th Cir. 2012).............15

*Brooks v. County Comm'n*, 446 F.3d 1160 (11th Cir. 2006) ...................................30

*Chapman v. AI Transp.*, 229 F.3d 1012 (11th Cir. 2000) .........................................30

*Clark Cnty. School Dist. v. Breeden*, 532 U.S. 268 (2001)......................................33

*Clark v. Coats & Clark, Inc.*, 990 F.2d 1217 (11th Cir. 1993)................................28

*Henderson v. City of Birmingham, Alabama*, 826 F. App'x 736 (11th Cir. 2020)...16

*Henderson v. FedEx Express*, 442 F. App'x 502 (11th Cir. 2011)...........................33

*Holifield v. Reno*, 115 F.3d 1555 (11th Cir. 1997) .................................16, 18, 20, 21

*Hopkins v. Saint Lucie Cnty. Sch. Bd.*, 399 F. App'x 563 (11th Cir. 2020) .............16

*Jefferson v. Sewon Am., Inc.*, 891 F.3d 911 (11th Cir. 2018) .............................16,17

*Johnson v. Miami-Dade County*, 948 F.3d 1318 (11th Cir. 2020)..........................33

*Jones v. Bessemer Carraway Med. Ctr.*, 151 F.3d 1321 (11th Cir. 1998)...............17

*Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313 (11th Cir. 2003)................18

*Lewis v. Blue Bird Corp.*, 835 F. App'x 526 (11th Cir. 2020) .................................29

*Lewis v. City of Union City*, 934 F.3d 1169 (11th Cir. 2019)..................................21

*Maynard v. Bd. of Regents*, 342 F.3d 1281 (11th Cir. 2003)...................................18

*McNeal v. Int'l Paper*, No. 21-12672, 2022 U.S. App. LEXIS 28082 (11th Cir. Oct. 7, 2022) ..................................................................................................19

*McPhie v. Yeager*, 819 F. App'x 696 (11th Cir. 2020)................................29

*Nix v. WLCY Radio,* 738 F.2d 1181 (11th Cir. 1984) ................................29

*Poer v. Jefferson Cty. Comm'n*, 100 F.4th 1325 (11th Cir. 2024) ............................22

*Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321 (11th Cir. 2011) ..........................21

*Standard v. A.B.E.L. Servs.*, 161 F.3d 1318 (11th Cir. 1998)............................15, 16

*St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993) ........................................28, 30

*Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239 (11th Cir. 2015)........................16

*Thomas v. Sheriff of Jefferson Cty.*, No. 22-13875, 2023 U.S. App. LEXIS 26637 (11th Cir. Oct. 6, 2023) ..............................................................................21

*Young v. UPS*, 575 U.S. 206 (2015) ..........................................................19

**Statutes**

42 U.S.C. § 1981 .................................................................................15, 16

42 U.S.C. 2000e, et. al. ....................................................................13, 15, 16, 29

## Statement of the Issues

1.  Did the District Court err in granting summary judgment in Appellee's favor on Appellant's disparate treatment claim asserted under 42 U.S.C. § 1981?

    a.  Did the District Court properly apply Rule 56 in finding that there were no genuine disputes of material fact?

    b.  Did the District Court properly determine Appellant failed to establish through either direct or circumstantial evidence (including through a "convincing mosaic" of "other evidence") that Appellant's termination was based on intentional discrimination?

    c.  Did the District Court properly determine that Appellant failed to establish a triable issue of pretext as to Appellee's termination decision?

    d.  Did the District Court err in failing to address the punitive damages issue?

2.  Did the District Court err in granting summary judgment in Appellee's favor on Appellant's retaliation claim asserted under 42 U.S.C. § 1981?

    a.  Did the District Court properly apply Rule 56 in finding that there were no genuine disputes of material fact?

    b.  Did the District Court properly determine Appellant failed to establish through either direct or circumstantial evidence (including through a

"convincing mosaic" of "other evidence") that Appellant's termination was based on a retaliatory motivation?

c.  Did the District Court properly determine that Appellant failed to establish a triable issue of pretext as to Appellee's termination decision?

d.  Did the District Court err in failing to address the punitive damages issue?

## Statement of the Case

### (i)    Course of Proceedings and Dispositions in the Court Below:

Appellee adopts this provision of Appellant's statement of the case.

### (ii)    Statement of Facts:[1]

Appellant, Jerry "Bernard" Jennings ("Jennings"), began working for Appellee, J.W. CHEATHAM, LLC ("JWC") on January 13, 2021, as a concrete finisher. (D.E. 35-1 at 52:5-9 )[1]; D.E. 35-2 at 54:13-55:2; D.E. 35-3 at P. 3) Appellant received a copy of JWC's Employee Handbook, including its harassment and discrimination policy and reporting procedures at the time of his hire. (D.E. 35-1 at 56:16-57:7) The procedures require employees to direct complaints regarding discrimination or harassment to their supervisor and/or the EEO officer, who is identified as Mike Damron. (D.E. 46-1, Employee Manual, at P. 12-14) Jennings' superintendent/supervisor was Jody Brooker, who supervised two concrete crews. (D.E. 35-2 at 57:25-58:2) Anthony Propst was the foreman over the flatwork concrete crew to which Jennings was first assigned. (*Id.* at 55:6-21)

Jennings testified Mr. Propst began making inappropriate racially-based comments towards him on day one of his employment and nearly every other day

---

[1] Citations to the record are to the Document numbers generated by the District Court's electronic filing system the page(s) of each Document as follows: "**D.E. __ at __**." All cited Documents are contained in the Appendix to Appellant's Principal Brief, which consists of four (4) volumes.

thereafter. (D.E. 35-1 at 55:15-56:8; 58:7-59:4) Jennings admitted he initially "overlooked" the comments and did not report them to anyone at JWC as required under JWC Employee Handbook. (*Id.* at 56:7-15; 57:25-58:6) Jennings admitted he did not report said comments to JWC until May 6, 2024,[2] when his wife made a call to HR and he was brought in and interviewed by Mike Damron (VP and head of HR for JWC). (D.E. 35-1 at 60:7-18; 62:23-63:2) Jennings testified he allegedly told Mr. Damron he was called "a few words" by the "foreman" (a.k.a. Propst), including the n-word during this meeting,[3] though he was initially reluctant to give any information. (*Id.* at 63:3-65:2)

There is no evidence of any prior complaints or issues of racial discrimination on the concrete crews, or otherwise within JWC. (D.E. 35-2 at 70:17-24; D.E. 35-1 at 86:22-24) Jennings claimed in his testimony that he did not want Mr. Propst to be terminated, he just wanted him to be talked to. (D.E. 35-1 at 63:9-16; 64:4-8, 21-23) Jennings claimed he was told Mr. Propst would be talked to. (*Id.* at 65:14-23)

---

[2] JWC's records show this meeting occurred May 6, 2021. (D.E. 35-3 at *Attachment B,* May 6, 2021 Incident report) Jennings testified it was around the second week in April, but May 6, 2021 could be "close." (D.E. 35-1 at 67:1-10)

[3] JWC disputes, among other things, that any *actual* complaint or specific information about racial comments, what was allegedly said, or who allegedly said it to Jennings, was provided during this meeting, rather there was only some unspoken insinuation that there may have been racial comments. (D.E. 35-2 at 61:21-63:16; D.E. 35-3, P. 4-5 (*Attachment B*)) Jennings' version of events has been relied upon for the purposes of summary judgment.

4

Jennings had no knowledge regarding whether a meeting with Mr. Propst occurred. (*Id.* at 66:14-16)

Mr. Damron met with Mr. Propst and another employee, Ray Oseguera, following this meeting, but could not corroborate the fact that any inappropriate comments were occurring. (D.E. 35-2 at 63:12-16; D.E. 35-3 at P. 4-5, *Attachment B* (May 6, 2021 incident report)) Jennings admitted Mr. Damron told him to come back and tell him if he experienced any further comments or issues. (D.E. 35-2, at 96:7-20; D.E. 35-1 at 66:5-10) Moreover, Mr. Damron made a point to make sure he said hello to Jennings on subsequent occasions when he would see him in the yard to make sure the door was open in case Jennings needed to talk to him. (D.E. 35-2 at 81:3-11)

Jennings testified the comments from Mr. Propst continued for about three months after this meeting, (D.E. 35-1 at 66:7-20; 67:14-20) but he never reported the alleged continued comments to Mr. Damron despite being informed to do so. (*Id.* at 68:2-5; D.E. 35-2 at 96:7-20)

Jennings claimed during his testimony that about three months after his meeting with Mr. Damron (around August of 2021), another employee named Ray allegedly greeted him by stating "what's up my n*****?" Mr. Propst was nearby. Both Ray and Mr. Propst denied that Ray used the n-word and instead claimed Ray said something else. (D.E. 35-1 at 70:2-71:11)

5

Right after this alleged incident, Jennings testified he told Mr. Brooker that Propst was "continuing to do the same thing as before." Jennings asserted he was then moved to the other concrete crew.[4] (*Id.* at 72:7-19; 73:5-22) The foreman on this crew was Wayne Seymour. (D.E. 35-2 at 56:12-13) Jennings admitted he never complained to anyone at JWC about Ray's alleged comments or conduct towards him. (D.E. 35-1 at 110:25-111:2)

Jennings asserted there was only one incident after he was moved to Mr. Seymour's crew. (*Id.* at 74:2-4) On January 25, 2022, Jennings testified he was breaking out concrete and Mr. Seymour wanted him to do it a different way. (*Id.* at P. 74:7-17) Jennings claimed Mr. Seymour used the phrase "I'm no dumb n******" during this conversation, after which he and Mr. Seymour got in a heated discussion and Mr. Seymour threw Plaintiff's tools on the ground. Jennings testified Mr. Seymour got in his face and was yelling at him. (*Id.* at 74:18-75:2) Jennings testified he raised his voice at Mr. Seymour only *after* Mr. Seymour raised his voice at him. (*Id.* at 74:5-75:5; 76:9-77:2; 78:6-10) Jennings testified Mr. Seymour then left to get supplies, and Plaintiff was told to go home. (*Id.* at 75:2-5)

---

[4] JWC disputes, among other things, Jennings' version of the events and contends he was moved to a different crew shortly after the May 2021 meeting and investigation into those vague complaints, in an abundance of caution. (D.E. 35-2 at 63:17-64:4) However, Jennings' version of the events is relied upon for the purposes of summary judgment.

Jennings testified he came into work the next morning and was again sent home. (*Id.* at 76:1-3) Jennings testified he called into HR this same day and spoke to Mike Damron and they had a "short" conversation during which Mr. Damron told Plaintiff he was terminated and JWC did not need him anymore. Plaintiff replied, "That's fine. It's cool." (*Id.* at 78:11-79:9; *see also* D.E. 35-2, at 87:11-24)

Jennings testified he did not tell anyone at JWC what happened from his point of view during the altercation between himself and Mr. Seymour; he only told his wife what happened. (D.E. 35-1 at 70:22-80:1) Jennings testified to the best of his knowledge there were no other times that he complained to anyone at JWC about race discrimination, other than those instances to which he had already testified (*i.e.*, the HR meeting in May 2021, and the subsequent comment to Jody Brooker about three months later). (*Id.* at 81:17-25; 82:12-25; *compare with id.* at 63:3-65:2; 72:7-19)

Jennings admitted he had no knowledge of what other employees who were on the job told Mr. Damron about what happened on January 25, 2022, between himself and Mr. Seymour. (*Id.* at 83:23-84:2) Mr. Damron was not on the jobsite and did not witness the altercation, so all he would know is what other employees told him. (*Id.* at 104:18-105:4)

7

Jennings disputes the version of events that was provided to Mr. Damron by other employees but knows of no reason why other employees would lie about what happened. (*Id.* at 102:9-104:16; 105:6-13; 106:16-107:15)

Mr. Damron received separate, corroborated accounts from Mr. Seymour, Andre Excellent, and Robert Rose, all suggesting that Jennings was the one that started the altercation and was yelling at and acting aggressively toward Mr. Seymour for no reason. (D.E. 35-2 at 83:8-84:1) Mr. Seymour was so shaken by the incident that he was almost in tears and was threatening to quit. (*Id.* at 82:25-83:2)

Mr. Damron sent Mr. Seymour home and then called in Mr. Excellent and Mr. Rose and interviewed them separately. (*Id.* at 84:2-4; 85:10-15) Mr. Excellent was interviewed first. Mr. Excellent (who is also Black) substantially corroborated Mr. Seymour's version of events, including Mr. Seymour's report that Jennings called Mr. Seymour the n-word. (*Id.* at 85:17-25) Mr. Excellent made a point to state Mr. Seymour did absolutely nothing wrong and Mr. Excellent would not stand by and watch someone get fired for something he did not do (*i.e.*, Mr. Seymour). (*Id.* at 85:17-19; 86:18-20) When asked whether employees were using the n-word on the jobsite, Mr. Excellent stated Jennings was the only person using the n-word. (*Id.* at 85:24-25) Mr. Damron interviewed Mr. Rose next and Mr. Rose gave "basically" the same story as the other two. (*Id.* at 86:20-87:1)

Mr. Rose testified that on the particular day in question, a cracked portion of concrete had to be removed and Mr. Seymour went to the truck to get a hammer to bust it up while Jennings stuck a shovel into the crack. (D.E. 41-3 at 32:13-19) Mr. Seymour told Jennings not to do it that way because it would chip. Mr. Seymour was speaking in a normal voice, but Jennings immediately copped an attitude with Mr. Seymour, things escalated, and they started arguing. (*Id.* at 32:20-22; 35:1-18) Mr. Rose testified that Jennings got in Mr. Seymour's face. (*Id.* at 36:7-14) Mr. Rose also testified that Jennings used the n-word repeatedly during the altercation. (*Id.* at 32:22-25; 42:4-6) Jennings was contending Mr. Seymour called him the n-word, but Mr. Seymour said he did not call Jennings the n-word. (*Id.* at 39:2-7) Mr. Rose did not hear Mr. Seymour call Jennings the n-word (*Id.* at 43:13-15) Mr. Excellent approached the two to break things up in the event a physical fight was going to ensue. (*Id.* at 43:23-44:) At some point, Mr. Seymour went to his truck, set Mr. Jennings' tool bag on the ground, and said he was leaving because "he wasn't taking this." (*Id.* at 41:21-25) Mr. Rose was interviewed by Mr. Damron the same day and truthfully told him what he witnessed of the altercation. (*Id.* at 50:12-15; 51:8-11)

Based on the substantially corroborated accounts, Mr. Damron concluded that Jennings was at fault for the altercation and would be terminated as the situation was likely to escalate and turn violent. (*Id.* at 87:2-7; D.E. 35-3 at 6-7 *Attachment C* (1/25/22 incident report)) Mr. Damron did not seek a statement from Jennings

9

because, based on the corroborated versions given by Mr. Excellent and Mr. Rose, it was a closed case in his opinion. (D.E. 35-2, at 98:24-99:7) Additionally, Mr. Damron was afraid of Jennings attempting to retaliate against the other employees for their reports about his behavior during the altercation, and Jennings did not say anything about the incident when Mr. Damron informed him of his termination. (*Id.*; D.E. 35-3 at P. 6-7, *Attachment C* (1/25/22 incident report)) Mr. Damron concluded that Mr. Seymour's use of the n-word during the altercation was not a statement warranting discipline because it was not directed towards Jennings but was rather a response elicited by Jennings. (D.E. 35-2, at 84:6-16; 100:3-14)

Mr. Damron was the sole decision maker regarding Jennings' termination. (D.E. 35-2 at 88:9-11) He made that decision following the interviews of Mr. Rose and Mr. Excellent on the same day of the incident and prior to informing Jennings of his termination the following day. (D.E. 35-3 at P. 2, ¶ 8)

Only on re-cross-examination, after being pushed regarding his prior testimony that he did not relay his version of the altercation to anyone at JWC, Jennings then testified (in direct conflict with his prior testimony) that when Mr. Damron told Jennings he was terminated, Jennings responded, "I'm being terminated for someone calling me a dumb n*****. That's cool." (D.E. 35-1 at 105:15-106:9)

10

Jennings testified he was terminated because of "discrimination," for reporting discrimination, and because he was coming up on his one-year anniversary when he claims he would otherwise receive a bonus and access to a 401(k). (*Id.* at 81:4-7) Jennings asserted his termination was the only retaliatory action he suffered. (*Id.* at 84:3-9)

Anthony Propst and Wayne Seymour were the foremen of the concrete crews upon which Jennings worked. As foremen, they were responsible for directing the work and ensuring it was properly completed when Mr. Brooker, the direct supervisor over the crews, or when another supervisor from another crew, was not around. (D.E. 35-2 at 66:6-7) They are considered field employees and not management. (*Id.* at 30:9-21) Above the foreman in the chain of command are superintendents, then the field superintendent, and then project managers and Tom Uhrig, and last, the owners of the company (Mike Damron and John H. Cheatham). (*Id.* at 31:2-32:1; 13:23-14:3)

### (iii)   Standard of Review:

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Cleotex Corp*., 477 U.S. at 322. Generally, the burden is upon the party moving for summary judgment, but once a party

11

demonstrates the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings using affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Id.*

A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014). Thus, a "genuine" issue is present when a reasonable trier of fact, viewing all the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof. *Id.*

Some factual disputes between the litigants will not defeat summary judgment because "the requirement is that there be no genuine issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, a mere 'scintilla' of evidence supporting the nonmoving party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party. *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1050 (11th Cir. 2015). The non-movant's evidence must be significantly probative to support the claims and there must exist a conflict in substantial evidence to pose a jury question. *Anderson*, 477 U.S. at 248-49.

## Summary of the Argument

Appellant claims that the District Court improperly applied a heightened version of Federal Rule of Civil Procedure 56. The District Court did not do so. Rather, the District Court decided the case according to the relevant and controlling case law and Title VII authority and principles as it was compelled to do. Appellant's entire contention of error is based on an apparent misapprehension of what is a *material* and *genuine* factual dispute in the context of this case and the applicable law.

Appellant also claims that the District Court improperly doomed his case based on the lack of a comparator. The District Court properly stated and determined that generally a disparate treatment claim is proven by pointing to a similarly situated comparator who was treated differently, and in the case of a lack of a comparator *and the absence of other evidence suggesting intentional discrimination,* summary judgment is proper. The District Court's ruling was not solely based on a lack of a comparator but also on the lack of *other probative evidence* upon which a reasonable jury could find intentional discrimination with regard to Appellant's termination.

Appellant likewise claims the District Court failed to consider the evidence he contended established a convincing mosaic of circumstantial evidence. While the District Court did not refer to the same explicitly as a "convincing mosaic," the District Court considered the evidence and correctly concluded that the same did not

support a finding of intentional discrimination by the decision-maker for Appellant's termination (Mr. Damron). The District Court also properly considered the overlapping alleged evidence of pretext and rejected the same.

In sum, the District Court found that while Appellant factually disputes what occurred during the altercation that formed the basis for his termination, Appellant did not point to a material dispute of genuine fact as to Mr. Damron's honest belief of the version of that altercation that was reported to him and upon which he determined that Appellant's employment should be terminated. This was not error.

As to Appellant's retaliation claim, the District Court properly determined it failed for the same reasons—that Appellant failed to sufficiently rebut JWC's legitimate business decision to terminate his employment and for the additional reasons laid out in JWC's Motion for Summary Judgment.

Regarding Appellant's punitive damages claims, the District Court did not need to reach the same because it properly determined that Appellant could not establish liability on his underlying claims.

**Argument**

### A. The District Court Properly Granted Summary Judgment on Appellant's Disparate Treatment Claim

#### 1. Standard for Evaluation of §1981 Claims

Appellant asserted his claims under 42 U.S.C. § 1981. Count I was a claim for disparate treatment, (*i.e.*, Appellant contended he was terminated based on his race). Appellant did not plead and assert a claim for hostile work environment. Count II was a claim for retaliation. The analysis of a race discrimination or retaliation claim under Title VII and Section 1981 is identical. *See Standard v. A.B.E.L. Servs.*, 161 F.3d 1318, 1330 (11th Cir.1998) (stating that Title VII and Section 1981 have the same requirements of proof and use the same analytical framework); *see also Anyanwu v. Brumos Motor Cars, Inc.*, 496 F. App'x 943, 948 (11th Cir. 2012). Therefore, Title VII caselaw is relevant to evaluation of the § 1981 claims.

Title VII authority and standards are the vehicle under which the District Court properly evaluated and ruled upon Appellant's claims. Contrary to Appellants contention, the District Court did not apply some heightened version of Federal Rule of Civil Procedure. It properly applied Rule 56 in the context of Appellant's claims and the controlling authority that applies to the same and found there were no *material* and *genuine* disputes of fact precluding the entry of summary judgment in JWC's favor; nor did it make impermissible credibility determination's in JWC's

favor. The District Court did not err in its application of the applicable law or its findings.

## 2. The District Court Correctly Found Appellant Failed to Present Direct Evidence to Support His Claims

To state a viable claim of discrimination under Title VII or § 1981, a plaintiff must assert facts that, when taken as true, are "sufficient to create an inference of discrimination." *Hopkins v. Saint Lucie Cnty. Sch. Bd.*, 399 F. App'x 563, 565 (11th Cir. 2010) (*quoting Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir. 1997) (quotation marks omitted). The major element in a disparate treatment claim is the fact that "the plaintiff suffered an adverse employment action due to intentional race discrimination." *Henderson v. City of Birmingham, Alabama*, 826 F. App'x 736, 740-41 (11th Cir. 2020) (quoting *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, at 1246(11th Cir. 2015)). Intentional discrimination may be proven by pointing to either direct evidence, or, in the alternative, circumstantial evidence. *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 921 (11th Cir. 2018)

Appellant contends the District Court erred in finding that Appellant has no direct evidence to support his discrimination claim. Direct evidence is "evidence, that, if believed, proves the existence of discriminatory intent without inference or presumption." *Jefferson*, 891 F.3d at 921 (alterations adopted and citation and internal quotation marks omitted); *see also stain*, 161 F.3d at 1330.  In applying this definition, the Eleventh Circuit has "marked severe limits for the kind of language

16

to be treated as direct evidence of discrimination." *Jones v. Bessemer Carraway Med. Ctr.*, 151 F.3d 1321, 1323 n.11 (11th Cir. 1998). The prototypical example of direct evidence includes "only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of" race. *Jefferson*, 891 F.3d at 922 (citation and internal quotation marks omitted).

Appellant contends that his testimony regarding the racially discriminatory comments allegedly directed to him by his first foreman, Mr. Propst (D.E. 35-1 at 55:15-56:8; 58:7-59:4), constitutes direct evidence of discrimination. However, as the District Court correctly found, Appellant's disparate treatment claim based on wrongful termination must necessarily look to evidence of intentional discrimination *by the decision maker* for his termination, Mr. Damron. There is no direct evidence of comments made by Mr. Damron toward Appellant nor is there any evidence of Mr. Damron's ratification of such comments. As also noted by the District Court, Mr. Damron encouraged Appellant to report any incidents of discrimination or harassment to him. (D.E. 35-2, at 96:7-20; D.E. 35-1 at 66:5-10) Appellant did not assert a hostile work environment claim, where Mr. Propst's direct comments would be direct evidence probative to support said claim. Appellant has no direct evidence of disparate treatment.

### 3. The District Court Correctly Found Appellant Lacks a Valid Comparator

A common circumstantial method to establish a disparate treatment claim is to prove that the plaintiff was treated less favorably by his employer than one or more similarly situated individuals outside his protected class. *See Maynard v. Bd. of Regents*, 342 F.3d 1281, 1289 (11th Cir. 2003); *Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1316 (11th Cir. 2003) (*per curiam*). "To make a comparison of the plaintiff's treatment to that of [an employee outside plaintiff's protected class], the plaintiff must show that he and the employees are similarly situated in all relevant respects." *Holifield v. Reno*, 115 F.3d 1555, 1556 (11th Cir. 1997). If a plaintiff cannot identify a similarly situated comparator who was treated more favorably than himself, "summary judgment is appropriate where *no other evidence of discrimination is present.*" *Id.* (emphasis added). The District Court found that Appellant did not have a valid comparator.

For the first time on appeal, Appellant now contends he does have a valid comparator, Mr. Ray Oseguera. Appellant claimed that Mr. Oseguera got in an altercation with Appellant during which Mr. Oseguera allegedly called Appellant the n-word, (D.E. 35-1 at 70:2-71:11) but was allegedly not disciplined or terminated. First, Appellant waived this issue by not raising it below. *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004). Second, to constitute a valid comparator, the other employee must be "similarly situated in all material respects," meaning that the plaintiff and the comparator are "sufficiently similar, in an objective

sense, [such] that they 'cannot reasonably be distinguished.'" *Id.* at 1218, 1228 (quoting *Young v. UPS*, 575 U.S. 206, 231, 135 S. Ct. 1338, 191 L. Ed. 2d 279 (2015)). This standard requires a case-by-case analysis, and minor differences in job functions between a plaintiff and a comparator are not dispositive as to whether they are similarly situated. *Id.* at 1227. However, a similarly situated comparator will ordinarily "have engaged in the same basic conduct" as the plaintiff, "will have been subject to the same employment policy," will have ordinarily had the same supervisor, and "will share the plaintiff's employment or disciplinary history." *Id.*

Here, JWC terminated Appellant's employment based on the finding that he was at fault and the instigator of a near-physical altercation with his foreman after taking issue with the foreman's work instruction (*i.e.,* insubordination and altercation). (D.E. 35-2 at 87:2-7; D.E. 35-3 at 6-7 *Attachment C* (1/25/22 incident report)) Based on Appellant's testimony, Mr. Oseguera did not get into an altercation with his foreman in response to a work instruction. Furthermore, Appellant has presented no evidence of Mr. Oseguera's employment or disciplinary history (nor is any contained in the record), which precludes the Court from performing a proper comparator analysis. *See McNeal v. Int'l Paper*, No. 21-12672, 2022 U.S. App. LEXIS 28082, at *8-9 (11th Cir. Oct. 7, 2022).

More importantly, Appellant admitted that he never reported Mr. Oseguera's conduct or comments to his superiors or anyone else at JWC (D.E. 35-1 at 110:25-

19

111:2); rather, he testified after this incident he only made a comment to Supervisor Brooker about Mr. Propst allegedly "continuing to do the same thing as before." (D.E. 35-1 at 72:7-19; 73:5-22) Notably, Mr. Damron testified he did not learn of any incident involving Jennings and Mr. Oseguera until after the lawsuit was instituted (and neither employee worked for JWC) by way of Mr. Oseguera telling him that Appellant was crazy and came at him with a shovel on one occasion. (D.E. 35-2 at 88:15-89:19) It stands to reason that another employee cannot be a valid comparator where the employer has no knowledge of alleged misconduct during the employment and therefore would have no opportunity to treat the other employee more favorably than the appellant. The District Court correctly found that Appellant lacked a valid comparator.

### 4. The District Court Correctly Evaluated the Evidence According to the "Convincing Mosaic"/Pretext Analysis

Appellant next contends that the District Court failed to evaluate the claim under the convincing mosaic standard. Although the District Court did not explicitly refer to a "convincing mosaic," the District Court performed the proper analysis. The District Court noted that in the absence of a comparator, summary judgment is appropriate where no other evidence of intentional discrimination is present. *Holifield v. Reno*, 115 F.3d 1555, 1556 (11th Cir. 1997). The convincing mosaic standard is simply an alternative way that a plaintiff can prove an inference of intentional discrimination in the absence of a valid comparator. In other words, it

20

is a method of using circumstantial evidence as the "other evidence" of intentional discrimination as referenced in *Holifield*. Importantly though the convincing mosaic analysis still must focus on circumstantial evidence that is probative of an interference intentional discrimination *on behalf the decisionmaker. Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) (plaintiff can survive summary judgment by "present[ing] a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination *by the decisionmaker*.") (emphasis added).

A "convincing mosaic" may be shown by "among other things, (1) suspicious timing, ambiguous statements ..., and other bits and pieces from which an inference of discriminatory intent might be drawn, (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019). In this vein, the convincing mosaic analysis naturally overlaps with the inquiry as to whether the employer's proffered legitimate business reason for the adverse action is pretextual. *See Thomas v. Sheriff of Jefferson Cty.*, No. 22-13875, 2023 U.S. App. LEXIS 26637, at *15 (11th Cir. Oct. 6, 2023) ("the whole 'convincing mosaic inquiry is identical to the final stage of the *McDonnell Douglas* framework: both ask whether there is enough evidence for a reasonable jury to infer intentional discrimination.'"). As the District Court correctly found, Appellant did

not present sufficient circumstantial evidence that could support a reasonable jury's finding that Appellant's termination was based on intentional race discrimination; nor is there sufficient evidence of pretext.

The evidence that Appellant contends supports the convincing mosaic and/or a finding of pretext, includes: his allegation that Forman Propst made racially derogatory comments towards him, Mr. Damron's alleged "shifting" reasons for moving Appellant to another crew after the first investigation in May 2021, that Propst's racial harassment of Appellant allegedly continued thereafter, that Mr. Damron's Incident Report regarding the January 2022 altercation between Mr. Seymour and Appellant is purported falsified, and that Mr. Damron failed to obtain a statement from Appellant before reaching his termination decision.

As discussed above, Mr. Propst's alleged racial comments towards Appellant are not relevant and do not support a finding that Mr. Damron's reason for terminating Appellant's employment over eight months later, was motivated by intentional race discrimination on the part of Mr. Damron. This is true even under a convincing mosaic analysis. *See, e.g., Poer v. Jefferson Cty. Comm'n*, 100 F.4th 1325, 1339-40 (11th Cir. 2024) (testimony regarding direct supervisor's alleged racial treatment and discriminatory comments was not sufficient circumstantial evidence under convincing mosaic standard support finding of intentional discrimination by ultimate decisionmakers of later termination). Here, there is no

22

record evidence of Mr. Damron making discriminatory comments towards Appellant, no claims of other employees being discriminated against on the basis of race by Mr. Damron, nor any other basis that would support the "convincing mosaic" as to Mr. Damron's decision.

Next, Appellant raises issue with Mr. Damron's testimony and records in this case suggesting that he was never made explicitly aware that Appellant or his wife were reporting specific racial comments or harassment during the May 2021 meetings and investigation. (D.E. 35-2 at 61:21-63:16; D.E. 35-3, P. 4-5 (*Attachment B*)) Appellant asserts Mr. Damron's credibility is called into question because Mr. Damron decided to move Appellant to the other concrete crew upon which Mr. Excellent (who is also Black) had worked for several years because Mr. Excellent had never complained regarding any issues of racism. (D.E. 35-2 at 63:17-64:4; D.E. 35-3 at P. 5 (Attachment B)) A factual dispute exists as to what was actually reported to Mr. Damron during these meetings in May 2021. But even considering the record in the light most favorable to Appellant, Appellant was informed Mr. Propst would be talked to (which is all he wanted to happen per his testimony) (D.E. 35-1 at 63:9-16; 64:4-8, 21-23; 65:14-23) and that Mr. Damron explicitly told Appellant to come back and report any other incidents. (D.E. 35-2, at 96:7-20; D.E. 35-1 at 66:5-10) Appellant admitted he had no idea whether Mr. Propst was talked to or not. (D.E. 35-1 at 66:14-16) Mr. Damron did speak to Mr. Propst and interview him after the

incident but was unable to confirm any comments occurred. (D.E. 35-2 at 63:12-16; D.E. 35-3 at P. 4-5, *Attachment B* (May 6, 2021 incident report)) Appellant further admitted that he never went back to Mr. Damron to report Mr. Propst's alleged continuing incidents of harassment (D.E. 35-1 at 68:2-5; D.E. 35-2 at 96:7-20), and therefore, even considering Appellant's version of the events, Mr. Damron did not have a further opportunity to address the same.

Once Appellant did allegedly make a complaint about Mr. Propst's alleged continuing comments to Supervisor Brooker (according the Appellant's version of events) he was immediately moved to the other concrete crew (D.E. 35-1 at 72:7-19; 73:5-22) and no further incidents of harassment at the hands of Mr. Propst (or anyone else occurred) for a matter of months, until the altercation with Mr. Seymour. (*Id.* at 74:2-4) These facts regarding Mr. Damron's actions cannot be said to give rise to a reasonable inference that Mr. Damron's decision to terminate Appellant based on a completely separate incident involving a different supervisor and different crew months later was motivated by discriminatory animus. Indeed, it is an entirely reasonable and non-discriminatory action to move an employee to a different crew where there have been no complaints of discrimination, in response to an allegation of the same. Under the same analysis, Mr. Propst's alleged continuing harassment of Appellant (which Appellant admits he did not report until months later) likewise does not support a reasonable inference of intentional discrimination *by Mr. Damron*.

24

Next, Appellant argues the evidence supports that the incident report Mr. Damron completed after the January 2022 altercation that led to Appellant's termination has proven to be falsified. Appellant contends that the information therein about the incident should be questioned because in typing up the incident report, Mr. Damron noted he would obtain written statements from the employees interviewed. (D.E. 35-3 at P. 6-7) Ultimately, those written statements were not completed. (D.E. 41-2 at P. 2) However, as the District Court corrected noted, this one slight inconsistency is not substantial enough to require a jury trial. (D.E. 47 at P. 7) This is because Appellant has not presented any evidence which suggests the version of the altercation contained in the Incident Report is not in accord with what those employees reported to Mr. Damron during his investigation or that Mr. Damron would have any reason to doubt the three corroborated accounts provided. In support of this argument, Appellant relies heavily on isolated testimony provided by employee Robert Rose when he was deposed in this matter over two years after the incident in question occurred. Appellant claims Mr. Rose testified that he only told Mr. Damron that Appellant and Mr. Seymour were yelling at each other and they both had bad attitudes. (D.E. 41-3 at 42:21-43:1, 43:4-23, 50:20-51.16) However, when reading Mr. Rose's full testimony in context, Mr. Rose provided a substantially similar account of the altercation in question as is reflected in the Incident Report as reported to Mr. Damron immediately after that incident by Mr. Seymour, Andre

Excellent,[5] and Mr. Rose. Notably, Mr. Rose testified that Appellant first coped an

attitude with Mr. Seymour when Mr. Seymour (in a calm and normal voice) asked

him not to break out the concrete with a shovel. (*Id.* at 32:13-22; 35:1-18) Thereafter,

the two argued with each other, Appellant got in Mr. Seymour's face and Appellant

was using the n-word repeatedly and contending that Seymour called him the n-

word, which Mr. Seymour denied. (*Id.* at 32:22-25; 36:7-14; 39:2-7; 42:4-6)

Moreover, Mr. Rose testified that Mr. Seymour did not start the argument, Appellant

did. (*Id.* at 49:21-25) Mr. Rose testified he truthfully reported what he witnesses to

Mr. Damron on the same date of the altercation. (*Id.* at 50:12-15; 51:8-11) Mr.

Damron testified that Rob Rose's story corroborated that provided by Mr. Seymour

and Mr. Excellent. (D.E. 35-2 at 86: 20-87:1) There's nothing within Mr. Rose's

testimony that substantially calls into question Mr. Damron's account and testimony

that all three employees gave basically consistent accounts of the altercation and

supported that Appellant was the instigator and at fault for the incident. Nothing

within Mr. Rose's testimony supports Jennings' version of the altercation, or more

---

[5] Notably, Appellant did not introduce any deposition testimony of Mr. Excellent into the record and there is no dispute that the version of events relayed by him to Mr. Damron (as reflected in both the Incident Report and Mr. Damron's testimony) was not the version of events relayed during the investigation. Appellant contends an inference is raised that this account is false, but such inference is unwarranted and not reasonable in light of the record. As noted by the District Court, Appellant could have and did depose employees but failed to present evidence that contradicted Mr. Damron's account of the employees' prior testimony. (D.E. 47 at P. 7)

importantly, suggests that Mr. Damron would have any reason to question the three corroborated accounts he received from those other employees or that he did not actually believe the three corroborated accounts.

Last as it pertains to the Incident Report, Appellant argues for the first time on appeal that a stray comment at the end of the Incident Report in the "Remarks" section, which states "False Report," also calls the report and Mr. Damron's testimony into question. (D.E. 35-3 at P. 7) Once again, Appellant has waived this argument by failing to raise it below. *Access Now, Inc.*, 385 F.3d at 1331. Indeed, there is no direct evidence in the record regarding what this comment meant, or to suggest it is even actually related to the incident at hand. Appellant himself acknowledges that it is unclear who the comment would be referring to but makes the unsupported inferential leap that it *must* mean that Mr. Damron was finding that Appellant made a false report—even though it is undisputed that Mr. Damron did not speak to Appellant before concluding his investigation and making the termination decision. (D.E. 35-2, at 98:24-99:7) Accordingly, the Court should either not consider this argument as it was waived or find that Appellant's suggested inference to be drawn therefrom is not reasonable based on the record.[6]

---

[6] A reasonable inference based on the record actually before the Court would suggest this stray comment is essentially a typo and holdover from a previous incident report, as Mr. Damron testified that he used the same word document for all incident reports and would write over a previous report template, then print it out or save over it.

27

Appellant completely misses the mark regarding what is a *genuine* and *material* factual dispute precluding summary judgment in relation to Mr. Damron's termination decision. There is no doubt that a factual dispute over what occurred during the altercation between Mr. Seymour and Appellant. According to Appellant, Mr. Seymour called him or at least implied that Appellant was a "dumb "n-word." (D.E. 35-1 at 74:18-75:2) All other witnesses and evidence in the record suggests that Appellant was responsible for the altercation when he got mad at Seymour for telling him how to do a work task, got in Seymour's face, and called Seymour the n-word, to which Seymour was prompted to respond, "I'm not an n-word." (*See, e.g.,* D.E. 35-2 at 83:8-84:1) But as the District Court correctly found, this factual dispute about what happened during the altercation is not a factual dispute sufficient to preclude summary judgment in this case.

"[T]o avoid summary judgment [the plaintiff] must introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination." *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1228 (11th Cir. 1993). A reason is not pretext for discrimination unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993) (emphasis in

_____

(D.E. 35-2 at 40:5-19) If this argument was raised below, direct evidence could have been taken to explain why "false report" was included in the end of the Incident Report.

original). The Court does not sit "as a super-personnel department that re-examines an entity's business decisions." *Alphin v. Sears-Roebuck and Co.,* 940 F.2d 1497, 1501 (11th Cir. 1991). As well, Title VII is not meant to be a shield against harsh treatment at the workplace and does not take away an employer's right to interpret its rules as it so chooses, and to make determinations as it sees fit under these rules." *Nix v. WLCY Radio,* 738 F.2d 1181, 1187 (11th Cir. 1984). "The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Id.*

"[A]n employer's honest belief based on information that the employee violated its policies can constitute a legitimate reason for termination even if the employer's belief may have been mistaken or wrong." *Lewis v. Blue Bird Corp.*, 835 F. App'x 526, 530 (11th Cir. 2020). The "pretext inquiry focuses on the honesty of the employer's explanation; raising a question about the correctness of the facts underlying that explanation without impugning the employer's honest belief, fails to create a triable pretext issue." *Dawson v. Henry Cnty. Police Dep't*, 238 F. App'x 545, 549 (11th Cir. 2007). Further, "[t]he pretext inquiry focuses on the employer's beliefs, not the employee's." *McPhie v. Yeager*, 819 F. App'x 696, 699 (11th Cir. 2020) (emphasis in original). A reason cannot be "pretext for discrimination unless it is shown both that the reason was false, *and that*

29

discrimination [or retaliation] was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993) (quotation marks omitted) (emphasis added); *see also Brooks v. County Comm'n*, 446 F.3d 1160, 1163 (11th Cir. 2006). The plaintiff "must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc) (citations omitted).

Appellant admitted that Mr. Damron was not present on the jobsite and would have no way of knowing what occurred other than through the accounts of other employees. (D.E. 35-1 at 83:23-84:2; 104:18-105:4) While Appellant disputes the version of events provided by the employees, he has provided no reason why those employees would lie about what they claim to have observed, nor any substantial and probative evidence to call Mr. Damron's testimony and account of what he was told into question.

Appellant also argues that Mr. Damron's failure to take a statement from him prior to making the termination decision suggests that the investigation was a sham. However, Mr. Damron clearly articulated his reasoning for not pursing a statement from Appellant. Based on the three substantially corroborated accounts, it was a clear case that Appellant was at fault for the altercation and further, he was worried about the possibility of Appellant retaliating against the other employees involved for

providing their accounts of the incident. (D.E. 35-2, at 98:24-99:7; D.E. 35-3 at P. 6-7, *Attachment C* (1/25/22 incident report)) This is a legitimate, non-discriminatory explanation for declining to pursue a statement from Appellant and likewise does not support a finding that discriminatory animus was the real reason for Appellant's termination.

Therefore, Appellant has failed to establish, through a convincing mosaic of circumstantial evidence or otherwise, that a triable issue regarding intentional discrimination or pretext exists on this record as it relates to his termination.

As correctly noted by the District Court:

> the Plaintiff's real dispute is with his fellow employees who (he says falsely) attributed blame on him, and with his employer for not doing (as he sees it) a better job at discerning the real truth. But that is not a basis for the Defendant to be held liable for racial discrimination.

(D.E. 47 at P. 7) The District Court did not err in its rulings and correctly entered summary judgment in JWC's favor on Appellant's disparate treatment claim.

**B. The District Court Properly Granted Summary Judgment on Appellant's Retaliation Claim**

**1. The District Court Properly Granted Summary Judgment on the Retaliation Claims Based on the Same Reasoning as under the Disparate Treatment Claim**

The District Court properly granted summary judgment in JWC's favor on Appellant's retaliation claim based on the same analysis set forth above under the disparate treatment claim. The District Court stated the retaliation claim, though subject to a slightly different analysis, failed for the same reasons articulated, mainly that Appellant did not have sufficient evidence of pretext (or, in the same vein, evidence to support an inference that a retaliatory animus was the cause of his termination) to create a triable issue.

JWC contends the District Court drew correct conclusions and relies on the same argument and analysis set forth above and as articulated in its Motion for Summary Judgment filed in the District Court.

**2. The Additional Arguments Advanced by JWC and Adopted by the District Court are Additional Bases for Summary Judgment in JWC's Favor**

The District Court adopted JWC's various other arguments raised in its Motion for Summary Judgment as it relates to the retaliation claim. In his Initial Brief, Appellant completely overlooks the arguments based on a lack of causal connection or temporal proximity regarding his alleged incidents of "protected activity" and his termination. Even taking Appellant's version of events as true, his

32

first complaint (during the meeting with Mr. Damron in May of 2021) predated his termination by eight months. (D.E. 35-1 at 60:7-18; 62:23-63:2) His second alleged complaint to Supervisor Brooker regarding Mr. Propst's alleged continued comments occurred about three months later, in or around August of 2021, which is still five months prior to his termination. (*Id.* at 72:7-19; 73:5-22) Binding case law establishes a delay of three months or more is insufficient to give rise to an actionable retaliation claim, and even less than three months is insufficient to establish "but for" causation in the absence of other meaningful evidence of retaliatory animus. *See, e.g., Clark Cnty. School Dist. v. Breeden*, 532 U.S. 268, 273, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001); *Henderson v. FedEx Express*, 442 F. App'x 502, 506 (11th Cir. 2011); *Johnson v. Miami-Dade County*, 948 F.3d 1318, 1328 (11th Cir. 2020) (holding that two months between plaintiff's engagement in protected activity and an adverse employment action was insufficient temporal proximity in a retaliation claim).

Appellant has raised nothing to overcome the temporal gap between his alleged protected activity and his termination, and as discussed above, any "other evidence" that he has pointed to in order to try and raise a circumstantial inference of intentional discrimination, likewise fails to raise a circumstantial inference of retaliatory animus on the part of Mr. Damron.

Furthermore, Appellant's alleged statement made to Mr. Damron after he was already informed of the termination decision of "so I'm being terminated for being called a dumb "n*****"" (D.E. 35-1 at 105:15-106:9), does not somehow revive or save his purported retaliation claim. As argued below and as accepted by the District Court: 1) this testimony can be rejected as akin to a sham affidavit; 2) the statement was not a clear enough to constitute "protected activity" and an actionable complaint of racial discrimination; 3) there is no causal connection because the alleged complaint came after the termination decision was already made; and 4) even if accepted, it only goes further towards Appellant's argument that Mr. Damron erroneously believed the other three employees over Appellant, which is not a sufficient basis to rebut his honest belief and establish that retaliatory animus was the real basis for Appellant's termination.

JWC otherwise relies upon the expanded briefing and authority on these issues contained in its Motion for Summary Judgment filed in the District Court below. (D.E. 36 at P. 11-12)

or these reasons, the District Court correctly granted summary judgment in JWC's favor on Appellant's retaliation claim.

## C. The District Court Did Not Need to Reach Appellant's Punitive Damages Claims

The District Court did not rule on the issue of punitive damages as it did not need to reach the same based on the finding of no liability. Should this Court see the

need to address the punitive damages issue, JWC relies on its briefing and argument below on this issue. (D.E. 36 at P. 12-15)

## Conclusion

In conclusion, the District Court correctly considered the record evidence presented to it, correctly applied Rule 56 as it relates to its findings that there exist no *genuine* and *material* disputes of fact precluding entry of summary judgment in JWC's favor on both of the claims asserted by Appellant. Likewise, the District Court did not make inappropriate credibility determinations to reach its rulings. Even considering Appellant's version of the events, his claims fail as a matter of law.

This Court should affirm the District Court's ruling in all respects.

Date: December 16, 2024.

*/s/Kayla M. Scarpone*
Kayla M. Scarpone
Florida Bar No. 0113606
DUNLAP & SHIPMAN, P.A.
2065 Thomasville Road, Suite 102
Tallahassee, FL  32308-0733
850-385-5000
850-385-7636  Facsimile
kayla@dunlapshipman.com
julie@dunlapshipman.com
*Attorney for Appellee*
*J. W. Cheatham, LLC*

## Certificate of Compliance

35

I hereby certify that this brief complies with the world limit set forth in Fed. R. App. P. 32(a)(7)(B)(i) in that it contains 8,404 words and complies with the typeface and style requirements because it is prepared in Times New Roman 14-point font. Fed. R. App. P. 32(a)(5)-(6), (g)(1).

## Certificate of Service

I hereby certify that on December 16, 2024, I electronically filed the foregoing with the Clerk of the Court via the CM/ECF system.

*/s/Kayla M. Scarpone*
Kayla M. Scarpone

36